PACIFIC FIRST FEDERAL SAVINGS BANK, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 27606-87.     Filed February 27, 1990.

*Alan S. Kaden* and *John F. Coverdale,* for the petitioner.
*Fera Wagner* and *Richard Osborne,* for the respondent.

OPINION

WELLS, *Judge:* Respondent determined the following deficiencies in petitioner's Federal income tax:

| Year | Deficiency |
|------|-----------:|
| 1978 | $1,743,066 |
| 1979 | 5,057,885 |
| 1980 | 2,512,321 |

After concessions, the issue presented is whether certain portions of section 1.593-6A(b)(5)(vi) and (vii), Income Tax Regs., are valid. For certain financial institutions, including petitioner, the deduction for addition to bad debt reserve is generally equal to a percentage of the financial institution's taxable income. The challenged portions of the regulation require that taxable income reflect any net operating loss carrybacks before the deduction for addition to bad debt reserve is calculated.

The facts are fully stipulated. We incorporate by reference the stipulation of facts and attached exhibits.

Petitioner is a corporation formed and existing under the laws of the State of Washington and having as its principal place of business when it filed its petition Tacoma, Washington.

From 1971 through 1980, petitioner used the calendar year as its taxable year and deducted amounts added to a reserve for bad debts. Petitioner calculated those amounts by using the "percentage of taxable income method" set forth in section 593(b)(2)(A).[1] For those years, section 166(c) permitted taxpayers to deduct a "reasonable addition" to bad debt reserve, in lieu of specific debts as they became worthless. Section 593(b) defined the term "reasonable addition" for certain financial institutions, including petitioner. Under that subsection, the deduction for addition to reserve with respect to "qualifying real property loans" (generally those loans secured by improved real property (sec. 593(d))) was subject to various limits, one of which was set forth in section 593(b)(2)(A). That provision limited the deduction to "the applicable percentage of the taxable income" for the year.[2]

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2] During relevant times, the portions of section 593 pertinent to the instant case provided as follows:

SEC. 593(b). ADDITION TO RESERVE FOR BAD DEBTS.—

(1) IN GENERAL.—For purposes of section 166(c), the reasonable addition for the taxable year to the reserve for bad debts * * * shall be an amount equal to the sum of—

\* \* \* \* \* \* \*

In 1981 and 1982, petitioner had net operating losses (NOLs) within the meaning of section 172(c) in the amounts of $43,459,246 and $27,748,382, respectively. Under section 172(b)(1)(F), those NOLs may be carried back to each of the 10 taxable years preceding the loss years.

Central to resolution of the instant case is the interplay between NOL carrybacks and the deduction for addition to bad debt reserve calculated under the percentage of taxable income method. Respondent contends that petitioner's NOL carrybacks from 1981 and 1982 reduce petitioner's deductions under section 593(b)(2)(A) for 1971 through 1977 by reducing the "taxable income" base used in calculating the deduction for each of those years. As a consequence, according to respondent, a larger portion of the 1981 and 1982 NOLs are "absorbed" by the increase in taxable income for 1971 through 1977, and a smaller portion of the NOLs remains available for the years in issue, i.e., 1978, 1979, and 1980. Deficiencies result for these years, according to respondent, because section 172(a) deductions are reduced or eliminated. In other words, respondent advocates an ordering rule which, under the facts of this case, results in faster absorption of NOLs.

Subdivisions (vi) and (vii) of section 1.593-6A(b)(5), Income Tax Regs., support respondent's position. The provisions

(B) the amount determined by the taxpayer to be a reasonable addition to the reserve for losses on qualifying real property loans, but such amount shall not exceed the amount determined under paragraph (2), (3), or (4) whichever amount is the largest, * * *

$$* \quad * \quad * \quad * \quad * \quad * \quad *$$

(2) PERCENTAGE OF TAXABLE INCOME METHOD.—

(A) IN GENERAL.— * * * the amount determined under this paragraph for the taxable year shall be an amount equal to the applicable percentage of the taxable income for such year (determined under the following table):

| For a taxable year beginning in— | The applicable percentage under this paragraph shall be— |
|---|---|
| 1971 | 54% |
| 1972 | 51 |
| 1973 | 49 |
| 1974 | 47 |

| For a taxable year beginning in— | The applicable percentage under this paragraph shall be— |
|---|---|
| 1975 | 45 |
| 1976 | 43 |
| 1977 | 42 |
| 1978 | 41 |
| 1979 or thereafter | 40 |

generally require that taxable income reflect any NOL carrybacks *before* the deduction for addition to bad debt reserve is calculated. Specifically, the pertinent portions of the regulation provide as follows:

(5) *Computation of taxable income.* For purposes of * * * [calculating the deduction for addition to bad debt reserve under the percentage of taxable income method], taxable income is computed—

\* \* \* \* \* \* \*

(vi) For taxable years beginning before January 1, 1978, without regard to any deduction the amount of which is computed upon, or may be subject to a limitation computed upon, the amount of taxable income, and without regard to any net operating loss carryback to such year from a taxable year beginning before January 1, 1979. (For purposes of this subparagraph, a net operating loss deduction under section 172 is not a deduction the amount of which may be subject to a limitation computed upon the amount of taxable income.)

(vii) For taxable years beginning after December 31, 1977, by taking into account any deduction the amount of which is computed upon, or may be subject to a limitation computed upon, the amount of taxable income, and any other deduction or loss allowed under subtitle A of the Code, such as any deduction allowable under section 172 or any loss allowable under section 1212(a), unless otherwise provided in this subparagraph.

For taxable years beginning after December 31, 1977, subdivision (vii) expressly requires that taxable income reflect the section 172(a) deduction prior to calculating the deduction for addition to bad debt reserve. For taxable years beginning before January 1, 1978, subdivision (vi) requires, by negative implication, that taxable income reflect NOL carrybacks from years beginning after December 31, 1978, prior to calculating the deduction. As originally promulgated on May 17, 1978, the ordering rule was to affect only taxable years beginning after December 31, 1977. T.D. 7549, 1978-1 C.B. 185, 186. Proposed amendments to the regulation would have required retroactive use of the ordering rule for NOL's occurring after 1977 (43 Fed. Reg. 60964 (Dec. 29, 1978)), but the regulation was amended on May 31, 1979, to have retroactive effect only for NOL's occurring after 1978. T.D. 7626, 1979-2 C.B. 239, 240.

Petitioner argues that the foregoing provisions are invalid and that it should be permitted to use the ordering rule in effect prior to publication of the regulation containing the challenged provisions on May 17, 1978. The ordering rule

proposed by petitioner requires calculation of the deduction for addition to bad debt reserve *before* any NOL carrybacks are reflected in the calculation of taxable income.

Prior to May 17, 1978, the applicable Treasury regulations were consistent with petitioner's method. They required or were interpreted to require that NOL carrybacks be disregarded when using the percentage of taxable income method to calculate the deduction for addition to bad debt reserve. The first regulations interpreting section 593 provided as follows:

the reasonable addition to a reserve for bad debts shall be an amount determined by the taxpayer which does not exceed the lesser of:

(1) The amount of its taxable income for the taxable year, computed without regard to section 593 and without regard to any section providing for a deduction the amount of which is dependent upon the amount of taxable income (such as section 170, relating to charitable, etc., contributions and gifts), * * * [Sec. 1.593-1(b)(1), Income Tax Regs. (1956).]

Respondent cited the foregoing regulation in a revenue ruling which required that NOL carrybacks be disregarded when computing the deduction for addition to bad debt reserve. Rev. Rul. 58-10, 1958-1 C.B. 246, 247.

After the Revenue Act of 1962 amended section 593, a new regulation was published that was more explicit than the original regulation. The new regulation provided that taxable income (for the purpose of calculating the deduction for addition to bad debt reserve under the percentage of taxable income method) should be calculated "without regard to any net operating loss carryback to such year under section 172." Sec. 1.593-6(b)(2)(iv), Income Tax Regs. (1964).

Thus, the provisions challenged by petitioner reversed an ordering rule that had been in effect for approximately 20 years. The following hypothetical example highlights the difference between the positions of the parties:

|  | 1971 | 1972 | 1981 |
|---|---|---|---|
| (1) Income before percentage method deduction | 1,000,000 | 1,000,000 | (1,000,000) |
| (2) Percentage method deduction at 54% for 1971 and 51% for 1972 | (540,000) | (510,000) | - - - |

|  | 1971 | 1972 | 1981 |
|---|---|---|---|
| (3) Taxable income before carrybacks | 460,000 | 490,000 | (1,000,000) |
| (4) Tax at 46% | 211,600 | 225,400 | - - - |

*Carryback Effect Under Prior Regs. (Petitioner's Position):*

|  | 1971 | 1972 | 1981 |
|---|---|---|---|
| (5) Taxable income before carryback | 460,000 | 490,000 | - - - |
| (6) NOL carryback absorbed | (460,000) | (490,000) | - - - |
| (7) Tax | - - - | - - - | - - - |
| (8) Refund due to carryback | 211,600 | 225,400 | - - - |
| (9) NOL carried to next year | (540,000) | (50,000) | - - - |

*Carryback Effect Under Challenged Rule (Respondent's Position):*

|  | 1971 | 1972 | 1981 |
|---|---|---|---|
| (10) Taxable income before carryback | 460,000 | Loss fully absorbed in 1971. Lines (1)-(4) above are unaffected. |  |
| (11) Add back percentage[3] method deduction | 540,000 |  |  |
| (12) Subtotal | 1,000,000 | - - - | - - - |
| (13) NOL carryback absorbed | (1,000,000) | - - - | - - - |
| (14) Tax | - - - | - - - | - - - |
| (15) Refund | 211,600 | - - - | - - - |
| (16) NOL carried to next year | - - - | - - - | - - - |

The challenged provisions were promulgated under the authority of section 7805(a), which authorizes the Secretary of the Treasury to "prescribe all needful rules and regulations for the enforcement of this title." Consequently, while the challenged provisions are entitled to deference, they are not entitled to as much deference as that owed to "legislative regulations," which are promulgated under more specific grants of authority. *United States v. Vogel Fertilizer Co.,* 455 U.S. 16, 24 (1982).

In *National Muffler Dealers Assn., Inc. v. United States,* 440 U.S. 472, 477 (1979), the Supreme Court set forth the following guidelines for adjudging the validity of an interpretative regulation:

In determining whether a particular regulation carries out the congressional mandate in a proper manner, we look to see whether the regulation

---

[3]The example ignores, for the sake of simplicity, that the taxpayer may be entitled to a deduction under an alternative method, such as the experience method, even if lack of "taxable income" prevents a deduction under the percentage method.

harmonizes with the plain language of the statute, its origin, and its purpose. A regulation may have particular force if it is a substantially contemporaneous construction of the statute by those presumed to have been aware of congressional intent. If the regulation dates from a later period, the manner in which it evolved merits inquiry. Other relevant considerations are the length of time the regulation has been in effect, the reliance placed on it, the consistency of the Commissioner's interpretation, and the degree of scrutiny Congress has devoted to the regulation during subsequent re-enactments of the statute.

With the foregoing precepts in mind, we hold that the challenged portions of section 1.593-6A(b)(5)(vi) and (vii), Income Tax Regs., are invalid.

## Plain Language of the Statute

Respondent contends that the plain language of the statute compels the ordering rule set forth in the challenged provisions. Respondent points out that section 593(b)(2)(A) limits the deduction for addition to bad debt reserve to a percentage of "taxable income"; that "taxable income" is defined in section 63 as gross income less the deductions allowed by Chapter 1, including the section 172(a) deduction for NOL's; that section 593(b)(2)(E) prescribes certain modifications to "taxable income," none of which involve section 172(a); and that, therefore, taxable income must reflect NOL carrybacks before the deduction for addition to bad debt reserve is calculated. Respondent also points out that various sections other than section 593, such as sections 170, 246, and 613A, expressly modify the section 63 definition of taxable income by excluding NOL carrybacks, while section 593(b)(2)(E) does not.

Respondent's argument presumes that section 593(b)(2)(E) sets forth an exclusive list of modifications to the section 63 definition of taxable income. Legislative history, however, can be used as an aid to construing even those statutes that appear clear. *United States v. American Trucking Assns.*, 310 U.S. 534, 543-544 (1940) ("When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination.' " (fn. ref. omitted)). The legislative history of section 593 discussed *infra* indicates that

respondent's interpretation is incorrect and that the statute is not free of ambiguity.

*Origin and Purpose of the Statute*

Moreover, we reject any suggestion that our inquiry is limited to the statutory language. *National Muffler Dealers Assn., Inc. v. United States* requires that a challenged regulation be examined for consistency with "the statute, its origin, *and* its purpose." *Supra* at 477 (emphasis supplied). When assessing the validity of a regulation, the Supreme Court has focused upon the will of Congress, rather than limiting the inquiry to the statutory language. In *United States v. Vogel Fertilizer Co., supra* at 26, the Supreme Court stated, "This Court has firmly rejected the suggestion that a regulation is to be sustained simply because it is not 'technically inconsistent' with the statutory language, when that regulation is fundamentally at odds with the manifest Congressional design."

Prior to 1952, certain financial institutions were exempt from Federal income tax. Exempt from taxation were "a mutual savings bank not having capital stock represented by shares," "a domestic building and loan association," and "a cooperative bank without capital stock organized and operated for mutual purposes and without profit" (Hereafter, we refer to the foregoing types of financial institutions as mutual institutions.). Secs. 101(2), (4), (15), I.R.C. 1939.

The Revenue Act of 1951 repealed the tax-exempt status of mutual institutions, but also granted them a generous deduction for addition to bad debt reserve. In fact, Congress amended section 23(k)(1) of the Internal Revenue Code of 1939 to permit mutual institutions to deduct as much as "net income for the taxable year, computed without regard to * * * [the deduction]," so long as the resulting reserve combined with surplus and undivided profits did not exceed 12 percent of "total deposits or withdrawable accounts." Sec. 313(e), ch. 521, 65 Stat. 490. Thus, Congress wanted to terminate the "substantial tax savings" enjoyed by mutual institutions, but, at the same time, sought to encourage ample reserves through the deduction for addition to bad

debt reserve. S. Rept. 781, 82nd Cong., 1st Sess. (1951), 1951 C.B. 458, 474.

The Revenue Act of 1962 somewhat curtailed the available deduction. Congress amended section 593 to permit mutual institutions to deduct "reasonable addition[s]" to reserves for "nonqualifying loans" (generally those loans not secured by improved real property (sec. 593(d))) as well as additions to reserves for "qualifying real property loans." The latter amount generally could equal the greater of (1) 60 percent of taxable income less the amount added to the reserve for nonqualifying loans, (2) an amount necessary to increase the reserve for qualifying real property loans to 3 percent of such loans, or (3) an amount based upon loss experience. For purposes of calculating the deduction under the percentage of taxable income method, the amended statute provided,

taxable income shall be computed (i) by excluding from gross income any amount included therein by reason of subsection (f) [pertaining to distributions from reserve to shareholders], and (ii) without regard to any deduction allowable for any addition to the reserve for bad debts.

The addition calculated under the percentage of taxable income method could not produce a reserve for qualifying real property loans greater than 6 percent of such loans. As before, total reserves combined with surplus and undivided profits could not exceed 12 percent of deposits. Pub. L. 87-834, sec. 6(a), 76 Stat. 977.

The House Report expresses Congress' dual concerns in enacting the foregoing changes. On one hand, Congress sought to tax mutual institutions. The report states, "Congress repealed [in 1951] the exemption of these mutual savings institutions * * * . At the same time, however, these institutions were allowed a special deduction for additions to bad-debt reserves which proved to be so large that they have remained virtually tax exempt since 1951." On the other hand, Congress wanted to ensure that ample reserves would be maintained and therefore preserved a generous deduction for additions to reserve. The report states, "The bill provides reserves consistent with the proper protection of the institution and its policyholders in the light of the peculiar risks of long-term lending on residential real estate which is the principal function of

these institutions." H. Rept. 1447, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 405, 436-437.

The Tax Reform Act of 1969 further curtailed the available deduction. Amendments to section 593 eliminated the method of calculating the deduction that had permitted mutual institutions to deduct an addition necessary to bring the bad debt reserve for qualifying real property loans to 3 percent of such loans. The percentage of taxable income method was modified by reducing the allowable deduction from 60 to 40 percent of taxable income over a 10-year period. Congress also further modified the method of calculating taxable income for section 593 purposes. Amendments required the exclusion of (1) net gain from dealings in corporate stock or tax-exempt obligations, (2) the lesser of 3/8 of net long-term capital gain or 3/8 of such gain from dealings in property other than that described in the first exclusion,[4] and (3) dividends giving rise to a dividends-received deduction less the "applicable percentage" of the deduction. Meanwhile, Congress extended the NOL carryback period from 3 to 10 years for mutual institutions and commercial banks. Pub. L. 91-172, secs. 431(b), 432(a), 83 Stat. 619, 620.

Legislative history indicates that Congress again struggled with competing considerations in enacting the foregoing changes. As in 1962, Congress believed that mutual institutions were paying less than a fair amount of tax. The House Report states:

> Your committee has reviewed the tax treatment of these mutual institutions. It has concluded that the present bad-debt reserve provisions are unduly generous as they have allowed these institutions to pay a much lower average effective rate of tax than the average effective rate for all corporations. * * * [H. Rept. 91-413, 1969-3 C.B. 200, 278.]

Yet, as in 1962, Congress' desire to ensure that mutual institutions pay taxes was counterbalanced to some extent by Congress' goal of encouraging reserves. Thus, the House Report explains:

> Your committee believes, that, notwithstanding a larger tax liability because of these changes in the bad-debt reserve deductions, there will

---

[4]Technical corrections to the Revenue Act of 1978 increased the percentage to 18/46. Pub. L. 96-222, sec. 104(a)(3)(C), 94 Stat. 215.

still be reserves consistent with the proper protection of the institution and its policyholders in the light of the peculiar risks of long-term lending on residential real estate which is the principal function of these institutions. Furthermore, to provide for unusually large losses, your committee has extended the net operating loss carryback from 3 to 10 years for all financial institutions, which allows the spreading of losses over 15 years—10 years back and 5 years forward. Your committee believes that this is a better means to provide for large unexpected losses than to allow such institutions to build up their reserves tax free. [H. Rept. 91-413, 1969-3 C.B. at 278.]

The House Report also contains a number of statistics, including the following:

| Tax as a percent of economic income: | *1966* |
| --- | --- |
| A. Commercial banks | 23.2 |
| B. Mutual savings banks | 6.1 |
| C. Savings and loan associations | 16.9 |

In response to the foregoing statistics, the House Report comments:

Since your committee's bill increases appreciably the 23.2 percent effective rate of tax for commercial banks, it is your committee's intention not only to bring the level of taxation of mutual savings banks (presently 6.1 percent) up to the level of savings and loan associations (16.9 percent), but also to provide an increase in the 16.9 percent rate somewhat comparable to the increase in the 23.2 percent rate for commercial banks. For this reason, the percentage deduction for additions to bad-debt reserves is being reduced from 60 percent to 30 percent, but this reduction is to take effect over a 10-year period. This percentage reduction in the formula will raise the effective rate of tax for these institutions, but will still leave some margin of tax advantage for them over commercial banks, which should preserve the inducement for them to continue investing in real estate mortgages. [H. Rept. 91-413, 1969-3 C.B. at 278.]

Thus, the House was cognizant of the effective rate of tax paid by mutual institutions and intended to raise, *but only to a specific and limited extent,* that effective rate by reducing the deduction for addition to bad debt reserve.

Moreover, while the House proposed to reduce the applicable percentage used under the percentage of taxable income method from 60 to 30 percent over 10 years, the Senate proposed a reduction to only 50 percent over 4 years. The Senate, like the House, was aware of the

effective rate of tax paid by mutual institutions (S. Rept. 91-552, 1969-3 C.B. 423, 526) and felt that a smaller increase in that effective rate was proper. The Senate Report states, "The committee believes that the reduction to 50 percent represents a sufficient increase in taxes for these mutual institutions at this time." S. Rept. 91-552, 1969-3 C.B. at 526. As noted, Congress ultimately decided to reduce the applicable percentage to 40 percent over 10 years.

The ordering rule found in the challenged portions of section 1.593-6A(b)(5)(vi) and (vii), Income Tax Regs., does not harmonize with Congressional intent. First, the effect of the new ordering rule (proposed in 1971 (36 Fed. Reg. 15050 (Aug. 12, 1971))) is to curtail the deduction for addition to bad debt reserve after Congress had already curtailed the deduction in 1969 and consciously rejected a proposal for a greater curtailment. In 1969, both the House and the Senate were aware of the effective rate of the tax paid by mutual institutions and sought to increase that effective rate to different, specific extents. In conference, Congress reached a compromise, deciding upon an increase greater than that proposed by the Senate but less than that sought by the House. The new ordering rule curtails the deduction for addition to bad debt reserve by contracting the taxable income base to which the applicable percentage is applied. The new ordering rule thereby increases the effective rate of tax for mutual institutions beyond the extent intended by Congress.

Second, the new ordering rule reduces the value of NOL carrybacks and is therefore plainly at odds with Congress' intent to ameliorate the effects of the 1969 curtailment by granting mutual institutions a "more generous net operating loss carryback." H. Rept. 91-413, 1969-3 C.B. at 280. When Congress extended the NOL carryback period from 3 to 10 years in 1969, it was well established that NOL carrybacks had no effect on deductions for additions to bad debt reserve for carryback years. The regulations so provided and there was no contrary authority specifically addressing the interplay between NOL carrybacks and the sections 166 and 593 deduction. Congress amended both (1) the bad debt reserve deduction provisions and (2) the net

operating loss carryback provisions in order to achieve a limited increase in the income tax levels of mutual institutions. In order to determine the effect of proposed changes and, if necessary, to modify the changes, Congress must have examined the then-effective regulations and concluded that those regulations correctly reflected Congress' intent as to how NOL carrybacks were to affect deductions for additions to bad debt reserve. Under the ordering rule of the later regulations, however, a carryback results in a "recapture," in effect, of a portion of the deduction for addition to bad debt reserve for the carryback year. As much as 60 percent (the applicable percentage for 1969) of a carryback is offset by a corresponding reduction in the deduction for addition to bad debt reserve. The full benefit Congress intended by its action in 1969 is thereby denied.

The legislative history also indicates that Congress did not intend that section 593(b)(2)(E) provide the exclusive list of modifications to the section 63 definition of taxable income. In both 1962 and 1969, Congress modified the method of calculating taxable income for section 593(b)(2)(A) purposes. In both years, Congress specified certain modifications to the section 63 definition of taxable income. Congress never, however, expressed any indication that pre-existing, regulatory, or administrative modifications to the section 63 definition (such as the prior ordering rule) were to be repealed and replaced by an exclusive, statutory list. Prior to the 1962 amendments, Revenue Ruling 58-10, 1958-1 C.B. 246, had construed section 1.593-1(b)(1), Income Tax Regs. (1956), as requiring the disregard of NOL carrybacks when calculating the deduction for addition to bad debt reserve. Prior to the 1969 amendments, section 1.593-6(b)(2)(iv), Income Tax Regs. (1964), had explicitly required that NOL carrybacks be ignored when calculating the deduction. Had Congress intended to supplant those and other administrative and regulatory modifications of the section 63 definition, we believe that some definite indication of such intent would appear in the legislative history. The complete absence of any indication that Congress intended to supplant such modifications of the section 63 definition is proof that Congress merely intended to enact

the modifications specifically dealt with in the statutory language.[5]

Further proof that Congress intended that pre-existing modifications remain in effect is the fact that any modification of the taxable income base would upset the legislative compromise reached in 1969. Contracting the base would result in a greater curtailment of the deduction for addition to bad debt reserve, while expanding the base would neutralize in whole or in part the curtailment approved by Congress.

Finally, the statute itself does not state that its list of modifications is exclusive. We also note that when Treasury initially proposed the new ordering rule, it supported the change by arguing that Congress had enacted an exclusive, statutory list of modifications to the section 63 definition in 1969. Respondent, however, has essentially discarded this argument, perhaps because of lack of confidence in its merit.

### Other Considerations

Other factors set forth in *National Muffler Dealers. Assn., Inc. v. United States* support our conclusion. 440 U.S. at 477. Although neither the challenged provisions nor the earlier ordering rule fairly can be characterized as "substantially contemporaneous constructions" of section 593 (see *United States Trust Co. v. Internal Revenue Service*, 803 F.2d 1363, 1370 (5th Cir. 1986)), the earlier ordering rule was promulgated much closer to the enactment of section 593's predecessor in 1951. The 1956 regulation had been proposed in 1955. 20 Fed. Reg. 7992 (Oct. 25, 1955). Although section 593's predecessor based the deduction on "net income," the regulation promulgated in 1964 expressly provided for the disregard of NOL carrybacks when calculating the deduction and was promulgated after the statute had been changed to refer to "taxable income." The manner in which the challenged provisions evolved also supports

---

[5]Because petitioner did not argue the reenactment doctrine (*Helvering v. Winmill,* 305 U.S. 79, 83 (1938)), we do not address the impact of the doctrine on Treasury's authority to promulgate the challenged provisions. Compare *Helvering v. R.J. Reynolds Tobacco Co.,* 306 U.S. 110 (1939) (Congressional approval of long-standing regulation precluded retroactive enforcement of amended regulation taking contrary position) and *Helvering v. Griffiths,* 318 U.S. 371 (1943) (reenactment doctrine cannot invalidate reasonable, prospective amendments to regulations).

our conclusion, as the provisions reversed a long-standing, consistent interpretation of the relevant statute.

We are mindful of the rule enunciated in cases such as *United States v. Southwestern Cable Co.*, 392 U.S. 157, 170 (1968): "the views of one Congress as to the construction of a statute adopted many years before by another Congress have 'very little, if any, significance.'" Accord *United States v. American College of Physicians*, 475 U.S. 834, 846-847 (1986); *Rainwater v. United States*, 356 U.S. 590, 593 (1958); *Mars, Inc. v. Commissioner*, 88 T.C. 428, 435 (1987) (refusing to consider Congressional intent behind amendments to section 367 which were not effective for transaction in issue). We do not believe, however, that the rule affects our conclusion. We do not rely upon the views of Congress in 1969 to construe an earlier enactment. Rather, our inquiry has been whether the challenged provisions harmonize with the intent behind section 593(b)(2), as amended by the Tax Reform Act of 1969, and in effect from 1971 through 1980, the years petitioner deducted additions to bad debt reserve.

That a regulation harmonizes with an extinct ancestor of a statute, and its purpose, should not suffice. In *National Muffler Dealers Assn., Inc. v. United States*, the Court considered a 1966 amendment to section 501(c)(6) in attempting to decide whether regulations interpreting "business league," a term first used in the Tariff Act of October 3, 1913, comported with Congressional intent. 440 U.S. at 478-479, 487. Also in *United States v. Vogel Fertilizer Co.*, 455 U.S. at 35, the Court stated, "it is the intent of the Congress that *amended* section 1563(a), not the views of the subsequent Congress that enacted section 414, that are controlling." (Emphasis supplied.) Thus, while the *views* of Congress respecting earlier enactments are given little weight, regulations must square with the purpose of a statute as it exists for the period in issue.

Respondent points out that the challenged provisions had been in effect for approximately 8 years when Congress amended section 593 as part of the Tax Reform Act of 1986. Respondent argues that Congress approved the ordering rule prescribed by the challenged provisions by reducing the applicable percentage to 8 percent without reverting

back to the old ordering rule. Pub. L. 99-514, sec. 901(b), 100 Stat. 2378. We find respondent's argument unconvincing. Assuming arguendo that the reenactment doctrine gave the challenged provisions the force of law in 1986, there is no indication that Congressional approval was retroactive. In *Helvering v. R.J. Reynolds Tobacco Co., supra,* the Court faced a scenario very similar to the one before us. A long-standing regulation provided that corporations did not recognize income from dealings in their own stock. Treasury then reversed its position, and respondent attempted to apply the new rule retroactively. The Court held for the taxpayer, reasoning that the earlier regulation had acquired the force of law. In response to respondent's argument that the new rule also had received Congressional approval, the Court stated:

But we have no occasion to decide this question since we are of opinion that the reenactment of the section, without more, does not amount to sanction of retroactive enforcement of the amendment, in the teeth of the former regulation which received Congressional approval, by the passage of successive Revenue Acts including that of 1928. [306 U.S. at 117.]

Respondent argues that unless NOL-adjusted taxable income is the basis for computing the deduction for addition to bad debt reserve, mutual institutions will create reserves out of deposits, rather than income, as contemplated by Congress. Respondent has failed to demonstrate that Congress was concerned that additions to reserve be made from income. In fact, section 593, as in effect for the relevant period, refutes respondent's contention, as it permitted additions to bad debt reserve based upon loss experience, without regard to taxable income. Sec. 593(b)(4).

Furthermore, the prior ordering rule does not enable petitioner or other mutual institutions to obtain "double deductions." Under the reserve method of accounting for bad debts, additions to a reserve for bad debts are deducted from income. No deduction is made, however, when an individual debt is deemed worthless. Rather, the reserve is charged in the amount of the debt. Conversely, the reserve is credited for debts collected after having been deemed worthless. *Thor Power Tool Co. v. Commissioner,* 439 U.S. 522, 547 (1979); *Black Motor Co. v. Commissioner,* 41 B.T.A. 300, 302 (1940), affd. 125 F.2d 977 (6th Cir. 1942).

To the extent mutual institutions receive some untoward benefit by using the percentage of income method for calculating their deductible addition in profitable years while shifting to a loss experience method after suffering losses, we respond by noting that Congress has given mutual institutions such latitude. Sec. 593(b)(1)(B).

To reflect the foregoing and concessions,

*Decision will be entered under Rule 155.*

Reviewed by the Court.

NIMS, CHABOT, KÖRNER, SHIELDS, HAMBLEN, COHEN, CLAPP, SWIFT, WRIGHT, WILLIAMS, and COLVIN, *JJ.*, agree with the majority opinion.

WHALEN, *J.*, concurs in the result only.

---

GEREER, *J.*, dissenting. I respectfully disagree with those who support the majority's opinion because they have chosen to invalidate a regulation which is a literal, accurate, and reasonable interpretation of unambiguous statutory provisions. This matter arose in circumstances under which respondent issued new regulations contrary to his original regulations and position. The superseded regulations had permitted the result being sought by petitioner. Although the majority has not shown that the new regulations are incompatible with the statutory structure, it has invalidated the regulation because of its perception of congressional intent. I cannot support the majority's holding because: (1) The regulations are unambiguous and in complete accord with an unambiguous statutory framework; (2) the effect of the majority's invalidation of the regulations will not carry out the congressionally intended result described in the majority opinion; (3) it permits a congressionally unintended benefit to a specific class of taxpayers, which is not available to any other class of taxpayers; and (4) the majority has failed to consider the Supreme Court's analysis and approach in an analogous and similarly situated case.

*Background*

The salient factors in this case are as follows:

(1) Petitioner is a savings bank which computes its reserve for losses under section 593. "This section * * * permits a taxpayer broad discretion to determine the amount of the addition to [its] reserve, not to exceed the limits set forth in section 593(b)." *The Home Group, Inc. v. Commissioner*, 91 T.C. 265, 266 (1988), affd. on other grounds 875 F.2d 377 (2d Cir. 1989).

(2) Petitioner, during the taxable years 1971 through 1977, could have chosen any of several statutorily permitted methods of computing its loss reserve. Some of the methods provide for computation of the reserve based upon actual experience. Another permits the use of an artificial statutorily permitted percentage of taxable income without regard to a taxpayer's actual loss experience. Petitioner, for its 1971 through 1977 taxable years, used the artificial percentage of taxable income method without regard to its actual loss experience to produce the largest permissible reduction of taxable income—a result envisioned by Congress to permit the flow of additional capital and provide for potential losses.

(3) As much as 10 years later, in 1981 and 1982, petitioner experienced net operating losses which generated a net operating loss deduction (NOLD), which petitioner sought to carry back to the taxable years 1971 through 1977. The NOLD reduces taxable income and may produce a tax refund from the years to which it is carried back. To the extent that the NOLD is not absorbed in the year to which it is carried back, it is carried forward to the next later year with taxable income, and so on. Petitioner wishes to have the benefit of being able to carry the NOLD further forward by applying it against an amount of taxable income in the carryback year which had been reduced by the maximum amount of reserve addition based upon a "taxable income" unreduced by the NOLD. In other words, petitioner wishes us to ignore the fact that taxable income had been reduced in the carryback year by an addition to the loss reserve based upon a percentage of taxable income. Respondent argues that taxable income must first be reduced by the NOLD before the reserve addition may be determined. It should be noted that respondent does not advocate that petitioner receive no allowance for its loss

reserve, but that it is not now feasible to compute it based upon the now-reduced amount of taxable income under the computation called for in the questioned regulation. It should also be noted that section 593 provides for alternative methods to compute an addition to the loss reserve without the percentage of taxable income limitation.

The appropriate question posed by these facts is whether petitioner is entitled to the double benefit of carrying back the NOLD and also retaining the artificial and purely mathematical addition to its loss reserve based upon the "pre-NOLD" or unreduced amount of taxable income.[1] The answer to this question is to be found in the definition of the term "taxable income." "Taxable income" is conceptually the bedrock of our income tax system. We must be careful not to weaken this structure by an inconsistent use of the basic principles which have been carefully formulated over the past 75 years. The majority has not shown or stated that the regulations[2] it invalidates do not comport with statutes (which are unambiguous on their face). The majority opinion is based upon a view that Congress intended a result opposite to that promulgated in respondent's regulation, even though the statutory provisions clearly and unambiguously comport with respondent's regulation. The majority also emphasizes respondent's 20-year practice of permitting the double benefit prior to promulgation of the regulation in question.[3]

---

[1]This is a double benefit because it would permit the benefits of the NOLD and the unreduced loss reserve at the same time. These benefits may both exist only if inconsistent concepts of taxable income are used. Moreover, as explained *infra*, the NOLD and addition to the loss reserve represent concepts which Congress intended to be inversely proportional, so that if one is larger, the other, by design, must be smaller. Here petitioner seeks for them both to be utilized without considering the other.

The record is silent on whether petitioner's particular accounting method with regard to reporting of actual losses or recoveries could result in the potential for double deductions. For purposes of this discussion it is assumed that the question of potential double deductions is not involved and should not be considered.

[2]The regulations require the reduction of taxable income by NOLD's and the recomputation of the addition to the reserve based upon the reduced amount of taxable income. In a recent opinion we held that taxpayers were permitted broad discretion to choose among the various methods for computing their reserve under sec. 593. *The Home Group, Inc. v. Commissioner,* 91 T.C. 265 (1988), affd. on other grounds 875 F.2d 377 (2d Cir. 1989). In that Court-reviewed opinion we permitted a taxpayer to select the method it wished for a 1969 taxable year during a 1988 controversy over the computation of a deficiency under Rule 155 of our Rules of Practice and Procedure.

[3]Respondent's inconsistent positions, whether expressed in revenue rulings or contained in superseded regulations, should be afforded little or no weight. To give credence to respondent's longstanding positions as a basis for holding a regulation valid or invalid, if

## Congressional Intent

The majority has expended substantial verbiage attempting to persuade us that Congress intended certain savings institutions to enjoy liberal loss reserves, which may result in the freeing of capital. To that extent, there is no disagreement. The disagreement concerns the majority's reasoning that these intentions are a basis for holding that certain savings institutions should have a more favorable definition or concept of "taxable income" applied to them in instances where they are carrying back a NOLD. No legislative history has been advanced by the majority for such a proposition and the statutes involved, as the majority must admit, do not provide for such a result. The essence of the legislative history advanced by the majority tells us that Congress intended that certain savings institutions, which were once tax-exempt, should be subject to taxation; and that said institutions were originally intended to have broad discretion to enjoy liberal deductions attributable to their loss reserves.

The majority also refers us to the legislative history for the undisputed proposition that the 10-year net operating loss carryback was intended as a substitute for permitting larger loss reserves. This proposition is more properly cited in support of this dissenting view that Congress did not intend to permit both the largest possible reserve and 7 additional years within which to carry back subsequent losses, as petitioner is seeking and the majority has approved in this case. The position advanced by petitioner and approved by the majority is inconsistent with congressional intent concerning the relationship between the 10-year carryback and the more generous percentage of taxable income loss reserve allowance. Therein lies the incongruity and shortcoming of the majority's logic.

If these institutions are to be subject to tax, the definition of "taxable income" utilized for them should be no different than the definition used for other taxpayers, unless specifically and congressionally mandated otherwise.

equally applied in other settings, may place us in a position of treating respondent's longstanding positions as correct by means of prescriptive preemption. If the regulations in question comport with the statute and congressional intent, should they be invalidated because of respondent's longstanding position or interpretation to the contrary?

Here, in the face of unambiguous statutory provisions, the majority would redefine "taxable income" based upon its own rationalized view of inexplicit congressional intent. It is inappropriate to find an otherwise lucid statute(s) to be ambiguous based upon legislative history (assuming such legislative history existed here).[4] Furthermore, it seems inappropriate to look to legislative history underlying prior statutory provisions when Congress has reenacted the provisions in question at a time when the questioned regulations had been published for nearly 8 years—a point for which the majority has already provided ample case support.

Congressional intent to expand or increase reserves or the amount of capital available for loans was fully served in this case. Throughout the period that ended with the net operating loss, petitioner received the benefit of computing its loss reserve allowance based upon a percentage of taxable income unreduced by the NOLD now in issue. By means of the beneficial computation in each of the years 1971 through 1977, petitioner ostensibly reported less taxable income and had more cash to loan while amassing a larger reserve for losses. The current recomputation of a portion of the addition to the reserve does not change the availability of that cash which was likely received by borrowers long before petitioner experienced a net operating loss in the 1980's. The only direct effect of the current recomputation is to determine the amount of the net operating loss deduction to be absorbed and, hence, the amount of any refund due the taxpayer. The recomputation, as it relates to the allowance for losses and the loss reserve, has no effect on the congressionally intended result.

Moreover, the congressional intent underlying the net operating loss deduction is also fully served by the ability of petitioner to seek refunds or reductions of tax liability from "carryback years" which would be currently available for the congressionally intended purpose of making capital

---

[4] The majority has proceeded a step beyond using the legislative history to assist in understanding a statutory provision. Indeed, without a supporting statutory provision or an ambiguity in the one the regulation tracks, the majority has devised a self-serving version of congressional intent. Commentators have cautioned us to be leery of congressional commentary even where it directly addresses the statutory matter. See Justice Scalia's comments in his concurring opinion in *Blanchard v. Bergeron,* 489 U.S. 87, 97 (1989).

available to the taxpayer who suffered the net operating loss. Here, however, petitioner, in addition to the favorable reserve benefits already received and those still available, asks us to use differing definitions of "taxable income" to provide to it benefits beyond those congressionally mandated. The concept of net operating losses is not unique to petitioner, as is the loss reserve addition permitted by Congress, and we cannot permit special treatment in an area involving a universal concept (like net operating losses or taxable income) without a clear and specific congressional mandate. As pointed out by the majority, the extra benefit relative to operating losses that Congress conferred upon these savings institutions was to permit a 10-year, rather than a 3-year, carryback. No additional benefit is described or should be inferred, including the one sought by petitioner in this case.

### The Double Benefit Aspect

The circumstances of this case have a direct and correlative relationship to the situation we considered in *The Home Group, Inc. v. Commissioner,* 91 T.C. 265 (1988), affd. on other grounds 875 F.2d 377 (2d Cir. 1989). That case also involved the computation of the addition to the loss reserve provided for in section 593. In that case, we permitted a taxpayer to make a choice concerning the amount of loss reserve to utilize because taxable income had increased due to a deficiency resulting from another matter decided adversely to that taxpayer, and hence the possibility for a larger reserve. Here we are confronted with a mirror image situation—the taxable income is reduced by a NOLD and the reserve addition (which is an element necessary to arrive at taxable income) should also be automatically reduced in accord with the statutory and regulatory formula for its computation.

Failure to reduce the loss reserve addition would result in the anomaly of no taxable income in a particular year and a large increase to the reserve for losses based upon a now-fictional amount of taxable income. Because the addition to the reserve results in a deduction used to arrive at taxable income, distortion and incongruity must result. Where a taxpayer's taxable income increases due to events

occurring subsequent to the taxable year in question, that taxpayer's addition to the loss reserve could increase. *The Home Group, Inc. v. Commissioner, supra.* Where a taxpayer's taxable income is to be decreased due to events occurring subsequent to the taxable year in question, pursuant to the majority's holding, that taxpayer's addition to the loss reserve would not be reduced.

Moreover, the majority has failed to emphasize (having relegated it to footnote 3 of the majority opinion) that, under respondent's computation, petitioner will be entitled to a deduction for a reserve allowance based upon one of the other formulae provided in section 593. It is significant to note that petitioner will be entitled to claim the largest deduction permissible under the methods which are not dependent upon gauging the maximum limit upon a percentage of taxable income. This will not place petitioner at a disadvantage in relation to other taxpayers carrying back net operating losses. Indeed, even after calculating the absorption of the loss by the method prescribed in the regulations, petitioner will remain in an advantaged position because it will not lose the ability to offset some amount of the NOLD by means of its statutorily computed addition to its loss reserve. Taxpayers who might lose the ability to claim a contribution deduction because of the interplay of a net operating loss in a particular year are not offered alternative methods of claiming that deduction. Although petitioner may lose the ability to claim the maximum benefit of the more generous percentage of taxable income method of computing its loss allowance, it would remain squarely within the intended congressional framework.

The adjustment to taxable income and resulting reduction to the reserve addition based upon taxable income is practically no different from the mechanical changes that affect "below the line" medical deductions and charitable and other percentage limitations based upon changes to adjusted gross or taxable income. See for example *Lustman v. Commissioner,* T.C. Memo. 1960-116, affd. 322 F.2d 253 (3d Cir. 1963). Likewise, on occasion, a change in basis may generate a concomitant change in depreciation. *Commissioner v. Superior Yarn Mills,* 228 F.2d 736 (4th Cir. 1955).

## Supreme Court Precedent

In *United States v. Foster Lumber Co.,* 429 U.S. 32 (1976), the Supreme Court considered a strikingly similar interaction between two relief or benefit provisions of the Internal Revenue Code. In that case, the focus, as it is here, centered upon the definition of "taxable income" for purposes of carrying back and applying a NOLD to a prior year. In *Foster Lumber,* the taxpayer had used an alternative computation of tax liability which was intended to insure that capital gains were not taxed above a certain rate, which rate may be more favorable than the rates on other types of income.

The alternative computation is made separately from the computation of other income, and, for computational purposes only, the amount of taxable income reflected in part of the computation does not include income from capital gains. In *Foster Lumber,* the alternative computation produced a lower tax than the regular computation. But the interplay of the NOLD from a subsequent year caused the absorption of all taxable income without permitting the benefit of the capital gains tax rate. The question decided by the Supreme Court was whether capital gain income had to be used as part of taxable income to be absorbed by the NOLD before it was carried to other taxable years.[5] The taxpayer argued that it would lose the benefit of the alternative tax computation if the capital gain portion of taxable income was used to absorb a portion of the NOLD. The Government argued that capital gain income was part of taxable income and must be used in the absorption process. The Supreme Court held for the Government.

In so holding, the Supreme Court, in part, rested its decision upon the concept that taxable income includes capital gains and the NOLD must be applied against or absorbed by all taxable income, irrespective of its characterization as ordinary or capital. The Court was cognizant that the use of the alternative tax computation produced a lower tax liability and that capital gains were not, in the

---

[5]This is, in essence, the same question which we address in this case. The only difference is one case involved an addition to taxable income (capital gains) and the other involves a reduction from taxable income (reserve allowance deduction). Otherwise, in principle and practice, the matters should be treated homogeneously.

computational sense, a part of taxable income when using the alternative capital gains method of computing the tax liability. Accordingly, the Supreme Court in *Foster Lumber* was forced, as we are in this case, to consider two competing benefits conferred by Congress. Its holding resulted in the taxpayer not receiving the full benefit of the alternative capital gains computation.[6]

In this case we are also confronted with a situation where there is interplay between two benefit provisions. As in *Foster Lumber,* carryback loss deductions are involved. Here, however, we consider a provision permitting certain savings institutions to liberally compute their loss reserves. Like the beneficial capital gains rates in *Foster Lumber,* petitioner had the benefit of a liberal section 593 artificial computation of the addition to its loss reserve based upon a percentage of taxable income. Similarly, the introduction of the net operating loss deduction reduces taxable income, which under the statutes and regulations would reduce the amount of the addition to the loss reserve if computed by the percentage of taxable income method. And finally, and again similar to *Foster Lumber,* the question concerns the concept or definition of "taxable income." Unlike *Foster Lumber,* the petitioner here will receive a congressionally intended deduction which will have the effect of increasing the amount of the NOLD carried to subsequent years. The difference is that the amount carried forward will be somewhat less than the amount petitioner seeks.

As in *Foster Lumber,* the majority here should have protected the concept of "taxable income" and the internal harmony of the tax code. As in *Foster Lumber,* the majority should have strived to treat all taxpayers utilizing net operating losses equally, unless there is a contrary and express congressional mandate to treat them otherwise. To have done so would not cause petitioner any overall hardship. If the majority had not invalidated the regulation, petitioner would have been treated, at very least, equal to other taxpayers who incurred net operating loss deductions. Instead, the majority's invalidation of the section 593

---

[6]See Justice Blackmun's dissent for further explanation of the benefits involved and the failure of the taxpayer to receive part of the benefits congressionally intended. *United States v. Foster Lumber Co.,* 429 U.S. 32, 49-52 (1976).

regulations here will permit petitioner a refund which is larger than the amount to which it is entitled. Moreover, the excess refund will not, in all circumstances, be recouped in some future taxable year. This is not simply a matter of timing.

I respectfully submit that petitioner should not be permitted to utilize an addition to its loss reserve based upon a concept of taxable income not specifically mandated in the statutes and/or unavailable to all taxpayers equally.

PARKER, JACOBS, PARR, and RUWE, *JJ.*, agree with this dissent.