BELL FEDERAL SAVINGS AND LOAN ASSOCIATION AND SUBSIDIARY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bell Fed. Sav. & Loan Ass'n v. Commissioner
Docket No. 11822-89
United States Tax Court
T.C. Memo 1991-368; 1991 Tax Ct. Memo LEXIS 417; 62 T.C.M. (CCH) 376; T.C.M. (RIA) 91368; August 7, 1991, Filed *417 Decision will be entered under Rule 155. P, an accrual method taxpayer, is a savings and loan association who made original home mortgage loans to borrowers. P recognized the prepaid interest it received from the loans (points) over an 8-year period using a half-year convention even though the borrowers brought to closing separate funds sufficient to cover both closing costs and points. Further, P incurred net operating losses (NOLs) during its 1983 and 1984 taxable years. P carried the NOLs back to its 1978 taxable year without recalculating the addition to its bad debt reserve for 1978 to reflect the carried back NOLs. HELD, absent an agreement between the parties to finance the points, when a borrower brings separate funds to closing sufficient to satisfy closing costs and points, the loan is a nondiscounted loan and P must recognize points it receives in the year the transaction closes. HELD, further, following our analysis in Pacific First Federal Savings Bank v. Commissioner, 94 T.C. 101 (1990), P is not required to recalculate the addition to its bad debt reserve for the taxable year to which NOLs are carried back. Joseph D. Ament and Anthony C. Valiulis *418 , for the petitioner. Erin Collins, for the respondent. HAMBLEN, Judge. HAMBLEN
MEMORANDUM OPINION Respondent determined deficiencies in petitioner Bell Federal Savings and Loan Association and Subsidiary's (hereinafter petitioner) 1978, 1985, 1986, and 1987 Federal income taxes in the amounts of $ 433,512, $ 177,424, $ 87,542, and $ 987,092, respectively. Respondent also determined additions to tax for petitioner's taxable year 1987 under section 6653(a)(1)(A) and (B)[1] and section 6661. [2]
The issues to be decided are: (1) Whether petitioner may defer the recognition of loan fees (hereinafter points) charged to a borrower *419 in connection with the borrower's financing of residential real estate when the points are paid by the borrower with funds separate from the financing transaction; and (2) whether taxable income, for purposes of computing the addition to bad debt reserve under the taxable income method of section 593(b)(2), must reflect net operating loss (NOL) carrybacks from subsequent years. Background
This case was submitted with all facts fully stipulated. The facts as stipulated are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Numerous concessions have been made by both parties. Petitioner is a domestic, Federally chartered savings and loan association having its principal place of business at 79 West Monroe Street in Chicago, Illinois, when the petition was filed in this case. For all relevant times herein, petitioner employed the accrual method of accounting and filed consolidated Federal income tax returns with the Internal Revenue Service Center in Kansas City, Missouri. A. Recognition of Points
One of petitioner's primary functions is the origination of mortgage loans. These mortgage loans include both newly *420 originated loans and refinanced first and second mortgage home loans. In connection with its mortgage loans, petitioner typically charged borrowers loan fees or points paid at the time of the loan closing. Points are an established business practice in the savings and loan industry in petitioner's community. Points are charges for the use of money and are considered prepaid interest in the lending industry. Petitioner does not, in whole or in part, rebate or refund the amount of points to a borrower if a loan is repaid prior to maturity. In an October 11, 1968, letter to Mr. Lloyd A. Byerhof, an accountant for petitioner, respondent approved petitioner's deferral method for recognizing points over an 8-year life with a half-year convention. As reflected in that letter, petitioner had requested permission from respondent to recognize points as income for Federal income tax purposes as earned by use of a composite basis. Respondent granted such permission based on the fact that petitioner "does not receive cash or a check for the points, and that the loan proceeds are disbursed net to the borrower." Under these circumstances, respondent granted petitioner permission "to change *421 its accounting treatment of points on discounted loans, for Federal income tax purposes, from the practice of including such points in income in the year the loan is made to the practice of including such points computed on a composite basis as referred to in Revenue Ruling 54-367, C.B. 1954-2, 109, in income in the year in which earned." During the taxable years at issue, petitioner deferred the recognition of points on both refinanced and newly originated real estate mortgage loans. Petitioner adopted a half-year convention and determined an 8-year life for the refinanced and newly originated real estate mortgage loans. Petitioner then recognized the points as income for Federal income tax purposes ratably over the 8-year life of the loans. Insofar as the points issue is concerned, respondent determined deficiencies in petitioner's returns for the taxable years 1985, 1986, and 1987. In computing the determined deficiencies, respondent included only the points paid by the borrowers where the borrower paid the points with separate funds at closing and where the loan was a newly originated real estate mortgage for, and secured by, the borrower's principal residence. *422 Respondent did not include in his deficiency determination points associated with second mortgages and refinanced loans originating during the taxable years at issue. During the years at issue, a typical mortgage loan transaction involved the completion of various documents and numerous steps. Initially, a borrower would enter into a contract to purchase real estate from a third party seller. At the time of the execution of the real estate contract, the borrower would pay the seller earnest money, leaving a balance to be supplied from the borrower's own and borrowed funds. With the intent of obtaining financing for a portion of the purchase price, the borrower would then complete petitioner's loan application and request a mortgage loan. Next, the borrower would sign the loan application, submit it to petitioner for its consideration, and pay petitioner $ 250 as a nonrefundable application fee. Shortly after the approval of the loan application, petitioner sends the borrower a commitment to make a mortgage loan at a stated interest rate. The loan commitment is signed by petitioner and then sent to the borrower. If the borrower accepts petitioner's offer, the borrower signs *423 the commitment and returns it to petitioner. The loan commitment is not binding until signed by the borrower. Petitioner's 1987 loan commitment letters stated, "The loan is subject to the following * * * Payment of [points] either as a discount out of the proceeds of the loan or as a fee paid at the time of settlement/closing of the loan." In April 1987, petitioner modified its requirements with respect to loan applications. Although petitioner still required the borrower to pay an application fee of $ 250 at the time of submitting the application, it also required the borrower to pay an amount equal to 1 percent to 1-1/2 percent of the face amount of the loan within 7 days of receiving the loan commitment from petitioner as an additional fee. The 1 percent to 1-1/2 percent was nonrefundable and enabled the borrower to lock in a specific interest rate for a specific period of time. After the executed commitment is received by petitioner, but prior to the loan closing, petitioner debits its real estate loan account in the full face amount of the loan and credits that amount to the borrower on a loan-in-process account (the LIP Account) established for that borrower's transactions. *424 The LIP Account is part of petitioner's in-house books and records (i.e. the general ledger). The LIP Account ledgers and the computer printout are never supplied to the borrower. During this debit and credit process, petitioner also credits to the LIP Account the amount of the application fee and the 1 percent or 1-1/2 percent payment received from the borrower. Petitioner then immediately debits the LIP Account in the amounts of these two payments. These in/out entries reflect that the borrower has paid these two amounts with his/her own separate funds and not with proceeds from the loan. As stated above, after the executed commitment is received by petitioner, but prior to the loan closing date, petitioner credits the borrower's LIP Account in the face amount of the loan. Petitioner also immediately deducts from that account the amount of the closing points charged to the borrower. At the time of the loan closing the borrower is required to pay, and did pay, separate fresh funds to petitioner in an amount equal to his downpayment, points, and other miscellaneous fees. In addition to providing these fresh funds, the borrower executes a mortgage note in the full amount of *425 the approved loan. The borrower's fresh funds are credited to the LIP Account. The borrower's fresh funds include the amount of the points charged. Also in this account are the net loan proceeds. At closing petitioner issues from the account checks to the seller, to certain creditors of the seller (e.g., to seller's broker), to the borrower's reserve account, and to other entities for closing costs owed by the borrower or seller. At closing, the borrower is also furnished a "Statement of Account," a "Settlement Statement," and a "Disclosure Statement." Petitioner has a fixed right to receive the points charged as of the loan closing date. B. Bad Debt Deduction
For all relevant years, petitioner was a mutual savings and loan association entitled to utilize the provisions of section 593 to calculate the addition to its bad debt reserve. For the years 1978, 1985, 1986, and 1987, petitioner calculated its annual addition to reserve for bad debts under the percentage of taxable income method provided for in section 593(b)(2) and deducted such addition in each taxable year on its Federal income tax return. Petitioner and respondent agree that the allowable percentage of taxable *426 income for purposes of the deductions for the taxable years 1985, 1986, and 1987 is a function of taxable income as finally determined for those years. Petitioner and respondent also agree that the bad debt deductions, as calculated on petitioner's originally filed tax returns for the taxable years 1978, 1985, 1986, and 1987, are prior to any of respondent's adjustments and prior to any adjustment for carrybacks of NOLs. The parties further agree that petitioner properly calculated additions to reserves for bad debts for each of the years at issue, subject to respondent's deficiency determinations herein. Petitioner's 1983 consolidated income tax return, Form 1120, reflected a NOL in the amount of $ 8,865,941. This 1983 consolidated loss was comprised of a loss by Bell Federal Savings in the amount of $ 8,978,719 offset in consolidation by a profit from Bell Savings Service Corporation (Bell Service) in the amount of $ 112,778 (before adjustments for charitable contributions in the amount of $ 11,475). Petitioner's consolidated income tax return, Form 1120, for the taxable year 1984 reflected a NOL in the amount of $ 5,336,627. This 1984 consolidated loss was comprised of a *427 loss by Bell Federal Savings in the amount of $ 5,487,586 offset in consolidation by a profit from Bell Service in the amount of $ 150,959 (before adjustments for charitable contributions in the amount of $ 12,925). The 1983 and 1984 NOLs were attributable to the financial entity Bell Federal Savings. None of the 1983 and 1984 NOLs were attributable to the nonfinancial entity Bell Service. For the taxable year 1983, $ 1,751,676 of the $ 8,865,941 NOL was carried back and absorbed in the taxable year 1977. The remaining 1983 NOL in the amount of $ 7,114,265 was carried back and absorbed in the taxable year 1978. A tentative carryback, Form 1139, was filed to carry back the 1984 NOL to the taxable year 1978, where it was fully absorbed. Respondent made the following adjustments: First, the 1984 NOL available for carryback was reduced because of adjustments to loan fee income reportable in that year. This reduction in the available NOL created an adjustment for the taxable year 1978. The second adjustment related to the restoration of the prior percentage-of-taxable-income bad debt deduction as a result of both the 1983 and the 1984 loss carrybacks. In applying the 1983 loss *428 carryback to the 1978 year, petitioner allocated the available loss against both financial income and nonfinancial (subsidiary) income. This allocation was computed based upon the ratios of 1978 financial income before the bad debt deduction to total 1978 consolidated income before the bad debt deduction and the ratio of 1978 nonfinancial income to total 1978 consolidated income before the bad debt deduction. Using these computed percentages, petitioner allocated a portion of the available loss carryback against financial income and a portion of the loss carryback was allocated against nonfinancial income. The same treatment was utilized for applying the 1984 loss to 1978. The available loss carryback for 1984 was applied in part against the remaining 1978 financial income and in part against the remaining 1978 nonfinancial income. Respondent determined that petitioner's treatment and allocation of the losses for 1983 and 1984 was improper. Respondent determined that petitioner should have applied the total amount of the losses first against income from the financial institution and only then apply any remainder to the nonfinancial institution. Discussion
A. Recognition *429 of Points
Respondent determined that petitioner must recognize in the taxable year of receipt income it receives in the form of points or loan fees from a borrower where petitioner has a contractual right to receive payment of the fee from the borrower's separate funds at closing and where the borrower brings sufficient outside funds to closing to cover the fee. Respondent asserts that the loans at issue were not discounted. Petitioner contends that it is appropriate for it to recognize the points over the 8-year life of the loans, as previously allowed by respondent. In support of petitioner's contention, petitioner asserts that the loans are discounted and that points are withheld from the loan proceeds before the proceeds are available to the borrower. Respondent's deficiency determination is presumptively correct, and the burden of proof is on petitioner to show that it is incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 78 L. Ed. 212, 54 S. Ct. 8 (1933). Section 451(a) provides that the amount of any item of gross income shall be included in the gross income of the taxpayer for the tax year in which received by the taxpayer unless, under the method of accounting used *430 in computing taxable income, such amount is to be properly accounted for in a different period. Section 1.451-1(a), Income Tax Regs., provides that, for taxpayers under the accrual method of accounting, income is includable in gross income when all the events have occurred that fix the right to receive such income and the amount thereof can be determined with reasonable accuracy. Under this "all events test," the right to receive income becomes fixed when the required performance occurs, when payment is due, or when payment is made, whichever happens first. Sec. 1.451-1(a), Income Tax Regs. Although they are not controlling precedent in this Court, we also note that long-standing administrative announcements adopt this interpretation. Rev. Rul. 74-607, 1974-2 C.B. 149; Rev. Rul. 70-540, 1970-2 C.B. 101. In the case before us, the question becomes: For purposes of the all events test, when was payment made? Petitioner argues that the loans were discounted loans where petitioner reduced the loan proceeds by the amount of the points before remitting the balance of the loan to the borrowers. In so doing, petitioner asserts *431 that the points were financed by the borrower and should be includable in petitioner's gross income over the life of the loan as the points are paid by the borrower. Respondent determined that the loans were not discounted. Respondent points to the fact that the borrowers brought sufficient separate funds to closing to satisfy the points paid to petitioner. Further, respondent refers to the fact that petitioner never relinquishes the points it charges, even if the loan is paid off in full before maturity. Notwithstanding petitioner's internal accounting processes, respondent determined that the borrowers paid petitioner the points at closing. Consequently, respondent determined that petitioner must recognize the points paid in the taxable year the loan transaction closed rather than over the life of the loan. Petitioner makes much of the fact that points constitute interest instead of fees for services. We agree. However, the fact that points are interest is not dispositive of the issue before us. The critical issue is not what points constitute, but rather when all the events have occurred that fix petitioner's right to receive the points. This issue boils down to whether *432 the loans were discounted or not discounted. If the loans were discounted, petitioner is correct in recognizing the points over the life of the loan. If the loans were not discounted, respondent is correct that petitioner must include the points in gross income in the taxable year the loan transaction closed. In determining whether the loans were discounted or not, we must examine the transactions themselves. Initially, we recognize that there is no agreement in the record before us between the borrower and petitioner supporting petitioner's assertion that the loans were to be discounted. Further, the LIP Accounts are petitioner's internal method of bookkeeping. These accounts were never explained or shown to the borrower. The borrower knows that he/she is required either to have the points paid from the proceeds of petitioner's loan or to pay them with his/her fresh funds at closing. When the borrower brings fresh funds sufficient to cover various closing costs and points to closing, the borrower has fulfilled his/her obligation to bring fresh funds to closing in an amount sufficient to cover the points. Petitioner's internal method of bookkeeping is insufficient *433 support for petitioner's claim that the loans were discounted. We conclude that the loans at issue before us were not discounted. Respondent correctly points out that the case before us is analogous to Franklin Life Insurance Co. v. United States, 399 F.2d 757 (7th Cir. 1968), cert. denied 393 U.S. 1118, 22 L. Ed. 2d 123, 89 S. Ct. 989 (1969). In Franklin, an insurance company loaned money to policyholders under an agreement that required the policyholders to pay currently the interest owed for the period from the inception of the loan to the end of the current policy year. Thereafter, the policyholders were to make interest payments annually on the anniversary date of the policy. When a loan was repaid during a policy year, the insurance company refunded the ratable portion of interest applicable to the remaining policy year. The court found that, although the insurance company was an accrual method taxpayer, the company must recognize the entire amount of interest paid at the time it was paid, not ratably over the policy year. In so holding, the court relied on the fact that the insurance company had unrestricted use of the money from the time of payment notwithstanding *434 the fact that the insurance company might have to refund a portion of the interest sometime within the policy year. The facts in the case before us places petitioner in an even weaker position than the insurance company in Franklin. Petitioner maintains unrestricted use and enjoyment of the points and does not under any circumstances refund the points to the borrower if the loan is paid off before maturity. Ample judicial authority exists supporting our decision that, where nonrefundable interest is prepaid to an accrual method taxpayer and where the taxpayer has to fulfill no further obligation to earn the interest, the taxpayer must recognize the interest currently. See Union Mutual Life Insurance Co. v. United States, 570 F.2d 382 (1st Cir. 1978), cert. denied 439 U.S. 821, 58 L. Ed. 2d 113, 99 S. Ct. 87 (1978); Life Insurance of Co. Georgia v. United States, 227 Ct. Cl. 434, 650 F.2d 250 (1981). Petitioner argues that its internal bookkeeping procedures establish that the loans were indeed discounted since petitioner reduced the amount of the loan proceeds by the amount constituting the points as soon as the loan proceeds were transferred *435 into the LIP Accounts. Petitioner asserts that it made a disbursement of the loan proceeds to the seller only after the loan proceeds were reduced by the points. Petitioner continues by contending that the remaining amount of the funds disbursed to the seller were paid by the borrower with new funds at closing. Petitioner's contentions do not address the facts before us. We must look to the agreement between petitioner and the borrower to determine if the borrower paid the points out of separate funds or if petitioner discounted the loan by the amount of the points and the borrower made up the discounted amount before the proceeds were disbursed to the seller. Any such express agreement as to the latter between petitioner and the borrower is lacking in the record. Our only guidance is the agreement by the borrower to pay petitioner points "either as a discount out of the proceeds of the loan or as a fee paid at the time of settlement/closing of the loan." This statement clearly does not support petitioner's contention or settle the issue. The facts before us simply do not establish petitioner's right to defer the recognition of points over the life of the loans. Further, it *436 is evident that petitioner had sole control over the LIP Accounts and the order of the steps taken in the transaction. By exercising its control over the disposition of the loan proceeds together with the separate funds brought to closing by the borrower, petitioner received enjoyment of the points and must realize them in income. Helvering v. Horst, 311 U.S. 112, 85 L. Ed. 75, 61 S. Ct. 144 (1940). "The power to dispose of income is the equivalent to ownership of it. The exercise of that power to procure the payment of income to another is the enjoyment, and hence the realization, of the income by him who exercises it." Helvering v. Horst, 311 U.S. at 118. In the case before us, petitioner agreed to pay the loan amount to the seller at closing. Petitioner can distribute the entire amount of the loan amount from the loan proceeds and collect the points it charged the borrower from the borrower's separate funds. Alternatively, petitioner can deduct the points from the loan proceeds and distribute the entire loan amount to the seller utilizing a portion of the borrower's separate funds to make up the now-existing deficiency in the loan proceeds due to the points discount. *437 Whichever way the transaction is structured, it is clear that petitioner is doing the structuring. Therefore, either the loans are not discounted (resulting in petitioner's recognition of the points in the taxable year of the transaction's closing) or the loans are discounted with petitioner exercising power over the points equivalent to ownership (resulting in recognition of the points in the taxable year of the transaction's closing under Helvering v. Horst, supra). Finally, respondent limited the deficiency determination to only those newly originated loans where the borrower borrowed money from petitioner in order to purchase his/her primary residence where the borrower brought sufficient funds to closing to satisfy the points paid to petitioner and where the financed residence secured the loan. In doing so, respondent has successfully demonstrated that, under these limited circumstances, petitioner's position would create a matching problem with section 461(g)(2). Section 461(g)(2) allows taxpayers to deduct points paid in respect of any indebtedness incurred in connection with the purchase or improvement of, and secured by, the principal residence *438 of the taxpayer as long as the amount of the loan and the points charged are within the established business practice of the area. Since borrowers can currently deduct points paid under the limitations of section 461(g)(2), matching principles dictate that, when those same points are paid to the lender, they should be included in the gross income of the lender. See Schubel v. Commissioner, 77 T.C. 701 (1981). In a true discount loan situation, the borrower cannot deduct points because no points have been paid. Schubel v. Commissioner, 77 T.C. at 704-705. However, if the borrower actually pays points from fresh funds, section 461(g)(2) allows for a current deduction, although the substance of the two transactions may be similar. Under the form of the loans at issue, petitioner had the right to receive points paid by the borrower with fresh funds at closing. Petitioner must accept the tax consequences of its choice of transaction form. Commissioner v. National Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 40 L. Ed. 2d 717, 94 S. Ct. 2129 (1974). Petitioner attempts to make much of the fact that it received permission from respondent in 1968 to recognize *439 points over an 8-year life with a half-year convention. It is clear respondent then allowed petitioner, as it does today, to defer recognition of points where petitioner enters into lending transactions where points are paid by the proceeds of the loan, i.e., discounted, and the borrower does not bring outside funds sufficient to cover closing costs and points. However, these are not the facts before this Court in the case at hand. In the case at hand, petitioner received the points from the separate funds of the borrower at closing. Nothing in the record, except petitioner's internal bookkeeping methods, supports petitioner's contention that the loans were discounted and, as above noted, that is not controlling. Therefore, we hold that the loans at issue were not discounted, and we hold that points petitioner received at closing must be recognized in the taxable year of the lending transaction's closing. B. Bad Debt Deductions
In addition to respondent's determined adjustments relating to the recognition of points, respondent also determined a deficiency for 1978 relating to petitioner's method of carrying back its NOLs. Respondent determined that petitioner's carryback *440 of NOLs requires petitioner to recompute the addition to its bad debt reserve, thereby reducing its bad debt deduction for the taxable year to which the NOLs were carried back. Further, respondent determined that petitioner did not properly apportion its consolidated NOLs from the taxable years 1983 and 1984 against its consolidated income in 1978, the carryback year. For the taxable year 1983, petitioner had a NOL of $ 8,865,941, comprised of an $ 8,978,719 loss by Bell Federal Savings offset by a $ 112,778 profit from Bell Service. [3] After a portion of the NOL was carried back to the taxable year 1977, $ 7,114,256 was carried back to the taxable year 1978. For the taxable year 1984, petitioner had a NOL of $ 5,336,627, comprised of a $ 5,487,586 loss by Bell Federal Savings offset by a $ 150,959 profit from Bell Service. 1. Effect of *441 NOL Carryback on Addition to Bad Debt Reserve
Respondent determined that petitioner must recompute its bad debt reserve for the year to which it carried back NOLs from later years. Petitioner argues that respondent's position is contrary to the intent of Congress and flies in the face of recent opinions of this Court. Petitioner bears the burden of proof to show that it is entitled to deductions greater than those allowed by respondent. Welch v. Helvering, 290 U.S. 111, 78 L. Ed. 212, 54 S. Ct. 8 (1933); Rule 142(a). This burden of proof includes establishing both the right to and the amount of the deduction. Commissioner v. National Alfalfa Dehydrating & Milling Co., supra; New Colonial Ice Co. v. Helvering, 292 U.S. 435, 78 L. Ed. 1348, 54 S. Ct. 788 (1934). Section 593 allows a mutual savings and loan association to compute an addition to its bad debt reserve as a statutory percentage of taxable income. Section 1.593-6A(b)(5)(vi) and (vii), Income Tax Regs., require that institutions that use this method must recalculate the addition to bad debt reserve if taxable income is reduced by subsequently generated NOL carrybacks. This Court has recently addressed the specific *442 issue of whether a savings bank's addition to bad debt reserve must be recalculated due to NOLs it carries back to the year at issue. See Pacific First Federal Savings Bank v. Commissioner, 94 T.C. 101 (1990). In Pacific First, we found that section 1.593-6A(b)(5)(vi) and (vii), Income Tax Regs., is invalid and contrary to Congress' intent to the extent that it requires taxable income to reflect NOL carrybacks before the deduction for additions to bad debt reserve is computed under the percentage of taxable income method. Pacific First Federal Savings Bank v. Commissioner, 94 T.C. at 107. [4]
Pacific First brought before us a similarly situated taxpayer under essentially the same set of circumstances. We see no reason and are not *443 persuaded to hold contrary to our recent opinion in Pacific First where there has been no demonstration of material differences in the applicable facts to justify such an endeavor. Therefore, we adhere to our Court-reviewed holding in Pacific First that section 1.593-6A(b)(5)(vi) and (vii), Income Tax Regs., is invalid. We further hold that petitioner is not required to adjust taxable income for NOLs carried back to the year at issue before computing the addition to its bad debt reserve under the percentage of taxable income method. 2. NOL Allocation
In applying the consolidated NOL from the taxable year 1983 to the taxable year 1978, petitioner allocated the loss against both the financial income of Bell Federal Savings and the nonfinancial income of Bell Service. This allocation was computed based upon the ratios of the 1978 financial income and the 1978 nonfinancial income before the bad debt deduction to the total 1978 consolidated income before the bad debt deduction. The taxable year 1984 NOL was carried back to the taxable year 1978 and was applied in part against petitioner's remaining 1978 financial income and in part against petitioner's remaining 1978 *444 nonfinancial income. Respondent determined that petitioner improperly allocated its 1983 and 1984 NOLs between its 1978 financial and nonfinancial income. Respondent contends that since the losses in 1983 and 1984 were from petitioner's financial entity only, losses must first be applied against the financial income of its entity in 1978. Respondent further contends that only the loss carrybacks which exceed the 1978 financial income are available to be applied against the nonfinancial income in 1978. By so doing, respondent asserts that the recomputation of the deduction for the addition to bad debt reserve for the year at issue must be done after the losses from each year are applied against the separate income of petitioner's financial entity. Respondent sets forth an intricate method of reporting pursuant to the regulations under section 1502. However, respondent's assertions are inapplicable in the case before us. As we have already found, supra, petitioner is not required to recompute the addition to its bad debt reserve when petitioner carries NOLs back to the year at issue. Since petitioner is not required to recompute the addition to its bad debt reserve based *445 on the carried back NOLs, we need not address how any such recomputation would be carried out. In the case before us, this question is moot. Petitioner asserts that since this Court has invalidated section 1.593-6A(b)(5)(vi) and (vii), Income Tax Regs., petitioner is entitled to a reordering of NOLs "for all years affected" where it applied NOLs under the now invalid regulations. To the extent that "all years affected" include years not before this Court in this proceeding, we will not comment on petitioner's assertions. To the extent that "all years affected" include the taxable year at issue, a reordering of NOLs is required due to the invalidity of the regulations as well as petitioner's failure to recognize points in the year the transaction closed, as held herein, supra. Conclusion
After reviewing the entire record, we hold that petitioner failed to properly report points it received on nondiscounted loans where the borrower brought to closing fresh funds sufficient to cover closing costs and points. We further hold that sections 1.593-6A(b)(5)(vi) and (vii), Income Tax Regs., are invalid and petitioner is not required to recompute the addition to its bad debt reserve *446 for a taxable year due to NOLs carried back to that taxable year. We have considered both petitioner's and respondent's other arguments and find them without merit. Due to concessions by both respondent and petitioner and due to our holdings in this opinion, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended and in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. After concessions by both parties, respondent's determined additions to tax for petitioner's taxable year 1987 have been resolved and are not at issue before this tribunal.↩
3. The loss and profit figures for petitioner for the taxable years 1983 and 1984 are shown prior to adjustments for charitable contributions made within the 2 taxable years.↩
4. Our decision in Pacific First Federal Savings Bank v. Commissioner, 94 T.C. 101 (1990), was followed in Peoples Federal Savings & Loan Association of Sideny v. Commissioner, T.C. Memo 1990-129↩.