BELL FEDERAL SAVINGS AND LOAN ASSOCIATION, Petitioner–Appellee,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellant.

No. 93–2679.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 13, 1994.

Decided Nov. 16, 1994.

Sharon Swarsensky Bilow, Anthony C. Valiulis, Jordan Z. Katz, Joseph D. Ament, Much, Shelist, Freed, Denenberg & Ament, Robert E. Ulbricht, Jill A. Dougherty, Kelly, Olson, Rogan & Siepker, Kenneth W. Gideon (argued), Wilmer, Cutler & Pickering, Washington, DC, for petitioner-appellee.

Michael L. Paup, Gary R. Allen, Bruce R. Ellisen, Frank P. Cihlar (argued), Dept. of Justice, Tax Div., Appellate Section, Washington, DC, for respondent-appellant.

Before LAY,* BAUER, and WOOD, Jr., Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

The Commissioner of Internal Revenue ("Commissioner") appeals the decision of the United States Tax Court that the appellee,

Bell Federal Savings and Loan Association ("Bell"), was not deficient in its income tax payments for the taxable year 1978. The Tax Court reached this decision after concluding that 26 C.F.R. § 1.593–6A(b)(5)(vi)–(vii) was invalid and contrary to Congress's intent. Issued by the Commissioner in 1978, the ordering rules of § 1.593–6A(b)(5)(vi)–(vii) provide that taxpayers such as Bell who utilize the percentage of taxable income method for computing bad debt reserve deductions must recalculate those bad debt reserve deductions if the taxable income for the tax year in question is later reduced by net operating losses carried back from a subsequent tax year under 26 U.S.C. § 172. For the reasons that follow, we reverse the tax court's finding that 26 C.F.R. § 1.593–6A(b)(5)(vi)–(vii) is invalid and we remand to the tax court for further proceedings.

I.

The facts in this case are fully stipulated and not in dispute. During the relevant period, Bell was a mutual savings and loan association ("mutual institution"), which qualified Bell for the special bad debt reserve deduction established by 26 U.S.C. § 593(a)(1) of the Internal Revenue Code.[1] Section 166(a) allows a taxpayer to take a deduction for a debt that becomes worthless within the taxable year. Section 166(c), as in effect for the period in issue in this case, provided that in lieu of taking a bad debt deduction under § 166(a), a taxpayer may instead claim "a deduction for a reasonable addition to a reserve for bad debts." Section 593(b) governs the calculation of the amount of the allowable addition to loan loss reserves and provides three different methods of computation which may be chosen by taxpayers such as Bell. Of these, Bell used the "percentage of taxable income" method established in § 593(b)(2) which allows a deduction for addition to loan loss reserves equal to a certain percentage of the taxpayer's "taxable income" for the year.[2]

---

* The Honorable Donald P. Lay, Circuit Judge for the Eighth Circuit, is sitting by designation.

1. All section references in this opinion will be to the Internal Revenue Code of 1954 (26 U.S.C.) unless otherwise indicated.

2. The other two methods are the percentage of loans method, wherein the deduction is based on

Congress has also enacted another procedure, relevant to this appeal, by which the tax liability of mutual institutions may be lessened. Section 172(b)(1)(F) allows these taxpayers to carry back a net operating loss ("NOL") sustained in one tax year to the ten tax years preceding the loss year. Bell sustained NOLs of $8,865,941 in 1983 and $5,336,627 in 1984. Bell carried its 1983 NOL back to the tax years 1977 and 1978, and it carried its 1984 NOL back to 1978.

A NOL, once carried back in this manner, is treated as a deduction for that previous tax year under § 173(a). Consequently, the taxpayer's income tax liability for that previous year is lessened. The taxpayer will thus usually file an amended return, which recomputes the taxpayer's income tax liability for that year, and seek a partial or total refund of the taxes it previously paid.

The problem that arises in this context, and which forms the crux of this appeal, is determining which taxable income figure the carried-back NOL should be applied to. This confusion derives from the tension inherent in the relationship between the deductions provided in §§ 172 and 593. The question here is whether the carried-back NOL should be deducted from taxable income before or after the "percentage of taxable income" method for calculating loan loss reserve deductions is employed. The Internal Revenue Code does not directly address this issue.

The Commissioner's regulations solve this problem by expressly requiring that § 172(a) NOL deductions be accounted for prior to the calculation of the loan loss reserve deductions. 26 C.F.R. § 1.593–6A(b)(vi)–(vii). Prior to the issuance of the current regulations, the Commissioner had in force regulations which provided for exactly the opposite approach—NOL deductions were not to be calculated until after the additions to loan loss reserves were calculated. 26 C.F.R. § 1.593–6(b)(2)(iv).

The end result of the new regulations is to increase the amount of taxes paid by taxpayers such as Bell. Since the bad debt reserve deduction is computed as a certain percentage of taxable income, the reduction of taxable income via the NOL deduction serves to concomitantly decrease the amount of the bad debt reserve deduction. At issue in this case is the validity of the new regulations. The tax court, relying upon its earlier holding in *Pacific First Fed. Sav. Bank v. Commissioner*, 94 T.C. 101, 1990 WL 16898 (1990), held that 26 C.F.R. § 1.593–6A(b)(vi)–(vii) "is invalid and contrary to Congress's intent." The Commissioner contests only Bell's calculation of its 1978 bad debt reserve deduction.

## II.

### A.

■ The courts of appeals exercise jurisdiction over decisions of the tax court "in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury." 26 U.S.C. § 7482(a). The facts in this case are not contested—the only issues for review involve the tax court's conclusions of law. Accordingly, we review the record *de novo*. *Merit Life Ins. Co. v. Commissioner*, 853 F.2d 1435, 1438 (7th Cir. 1988), *vacated on other grounds*, 492 U.S. 902, 109 S.Ct. 3208, 106 L.Ed.2d 559 (1989).

### B.

The Commissioner argues that the tax court erroneously invalidated 26 C.F.R. § 1.593–6A(b)(5)(vi)–(vii). Two other circuit courts have already addressed this issue and they both rejected the tax court's reasoning behind its *Pacific First* decision and affirmed the validity of the challenged regulation. *See Pacific First Fed. Sav. Bank v. Commissioner*, 961 F.2d 800, 805–08 (9th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 209, 121 L.Ed.2d 150 (1992); *Peoples Fed. Sav. & Loan Assoc. of Sidney v. Commissioner*, 948 F.2d 289, 304–05 (6th Cir.1991). "Respect for the decisions of other circuits is especially important in tax cases because of the impor-

---

a specified percentage of relevant loans, and the experience method, wherein the deduction is based upon the institution's actual loan loss ex-

perience. Eligible financial institutions may calculate their deductions under whichever method yields the largest deduction for the taxable year.

tance of uniformity, and the decision of the Court of Appeals of another circuit should be followed unless it is shown to be incorrect." *Federal Life Ins. Co. v. United States*, 527 F.2d 1096, 1098–99 (7th Cir.1975) (per curiam) (citing *Goodenow v. Commissioner*, 238 F.2d 20, 22 (8th Cir.1956)). The reasoning behind the Ninth and Sixth Circuits' opinions is persuasive and, as discussed below, we cannot show it to be incorrect. The thorough consideration to which this matter has already been treated by the Ninth and Sixth Circuits obviates the need for us to delve into this matter in depth; we strive here only to summarize and synthesize the Ninth and Sixth Circuits' analyses upholding the validity of the treasury regulation at issue.

### III.

The challenged regulation was issued by the Treasury Department under its authority to "prescribe all needful rules and regulations for the enforcement" of the Internal Revenue Code. 26 U.S.C. § 7805(a). The Ninth and Sixth Circuits adopted slightly different approaches for determining the validity of this interpretive regulation, but both approaches apply essentially the same test and the application of either approach leads to the same result in this case.

The Sixth Circuit applied the rule of deference established by *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), which holds that "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based upon a permissible construction of the statute." *Id.* at 843, 104 S.Ct. at 2782 (footnote omitted). The Ninth Circuit, on the other hand, chose to rely more narrowly upon the "traditional rule of deference to Treasury Regulations." *Pacific First*, 961 F.2d at 803. In particular, the Ninth Circuit cited *National Muffler Dealers Assoc., Inc. v. United States*, 440 U.S. 472, 99 S.Ct. 1304, 59 L.Ed.2d 519 (1979), which held that where the Internal Revenue Code is silent or unclear on an issue, "this Court customarily defers to the [treasury] regulation, which, if found to implement the con-

gressional mandate in some reasonable manner, must be upheld." *Id.* at 476, 99 S.Ct. at 1307 (quotations omitted). Although the difference between these two approaches is negligible at best—any regulation which is "based upon a permissible construction" of an ambiguous statute will almost always "implement the congressional mandate in some reasonable manner" and vice versa, the Ninth Circuit is correct to rely upon the more narrowly tailored holding of *National Muffler.*

■ The proper test for the validation of a challenged regulation thus requires only that the regulation issued by the Commissioner constitute a reasonable implementation of Congress's mandate. The Commissioner's interpretation need not be the only, or even the most, reasonable interpretation possible as "[t]he choice among reasonable interpretations is for the Commissioner, not the courts." *National Muffler*, 440 U.S. at 488, 99 S.Ct. at 1312; *see also Chevron*, 467 U.S. at 843 n. 11, 104 S.Ct. at 2782 n. 11.

### A.

■ The starting point of our analysis is the language of the relevant statutes. "In determining whether a particular regulation carries out the congressional mandate in a proper manner, we look to see whether the regulation harmonizes with the plain language of the statute, its origin, and its purpose." *National Muffler*, 440 U.S. at 477, 99 S.Ct. at 1307. The regulation challenged here involves the interaction of §§ 593(b)(2), 63(a), and 172(a).

Section 593(b)(2)(A) allows for a yearly bad debt reserve deduction in "an amount equal to the applicable percentage of the taxable income for such year." Section 593(b)(2)(E)[3] qualifies the term "taxable income" somewhat by providing that for purposes of the percentage of taxable income method, "taxable income shall be computed" by excluding certain listed items from gross income and without regard to the bad debt reserve deduction itself. Section 593(b)(2) does not otherwise define "taxable income"—we must

---

**3.** The modern version of this subsection is found at § 593(b)(2)(D).

turn to the general definition provided in § 63(a) which states that "the term 'taxable income' means gross income minus the deductions allowed by this chapter." Section 172(a) in turn "allow[s] as a deduction for the taxable year" an amount which includes the NOL carrybacks to that year.

Viewed against this backdrop, the manner in which the Commissioner's regulation implements these statutes cannot be viewed as unreasonable. As described above, 26 C.F.R. § 1.593–6A(b)(5)(vi)–(vii) obliges taxpayers who carryback NOL deductions to subtract that NOL deduction from their taxable income figure *before* they compute their allowable bad debt reserve deduction under the percentage of taxable income method. The regulation thus requires only that the § 172(a) NOL deduction be viewed as one of those deductions to be taken into account when computing "taxable income" under § 63(a). There is nothing unreasonable about treating the § 172(a) NOL deduction like any other deduction here—especially since the existence of the explicit exclusions from taxable income provided in § 593(b)(2)(E) indicate that Congress knew how to exclude a given amount when it wanted that amount excluded. It is true, however, that § 593(b)(2) does not expressly state whether § 172(a) NOL deductions must be excluded from taxable income in this manner, and it is therefore conceivable that a regulation could so exclude them and still be reasonable, but once again "the choice among reasonable interpretations is for the Commissioner, not the courts." *National Muffler,* 440 U.S. at 488, 99 S.Ct. at 1312.

We do not reach the Commissioner's arguments that the challenged regulation is compelled by the relevant statutory provisions, rather we hold only that 26 C.F.R. § 1.593–6A(b)(5)(vi)–(vii) serves to reasonably implement those statutes.

### B.

The challenged regulation also harmonizes with the origin and purpose of the relevant statutes. In brief, the history of the taxation of mutual institutions reveals a steady passage from an era of total exemption from federal income taxation to the current version of the Internal Revenue Code wherein these institutions are afforded nearly the same treatment as all other corporations. *See Peoples Federal,* 948 F.2d at 297–98. This shift in policy mirrors the change in lending practices that these mutual institutions have undergone. Originally, mutual institutions made loans only to members—thus there was technically no profit realized by the institution itself since the members were doing business with themselves and since the earnings of the institution belonged to the depositors. Eventually, mutual institutions came to make loans primarily to nonmembers—thus realizing outside profits while directly competing with other financial institutions that did not enjoy a similar tax advantage.

A comparatively modest percentage has been retained for purposes of computing the bad debt reserve deduction under the percentage of taxable income method—the current figure is eight percent. Section 593(b)(2)(a). The purpose of retaining any deduction is to encourage mutual institutions both to continue investing in real estate mortgages and to maintain the proper level of bad debt reserves. H.R.Rep. No. 413, 91st Cong., 1st Sess., pt. 1, at 125 (1969), *reprinted in* 1969 U.S.C.C.A.N. 1645, 1775.

During this period of increasing taxation, Congress simultaneously extended the NOL carryback period from three to ten years. Congress did so both in an apparent effort to counterbalance somewhat the higher income taxes mutual institutions were paying due to the amendments to § 593 and in light of its view that a longer carryback period was "a better means to provide for large unexpected losses than to allow such institutions to build up their reserves tax free." *Id.* Thus we see that while Congress greatly increased income tax liability overall, it did maintain some small margin of tax advantage for mutual institutions.

That the Commissioner's new regulation serves to even further increase the amount of income tax owed by mutual institutions does not render it disharmonious with the origin and purpose of the relevant statutes. Although overall tax liability is increased, 26

C.F.R. § 1.593–6A(b)(5)(vi)–(vii) mainly serves to increase consistency within the Internal Revenue Code by treating NOLs which are carried back to an earlier tax year the same as losses actually realized in that earlier year.[4] The new regulation accomplishes this goal by requiring that taxpayers subtract their NOL carryback deduction from taxable income—along with all of their other deductions except those specifically excluded by § 593(b)(2)(E)—before computing their bad debt reserve deduction. The regulation does not repeal the percentage of taxable income method of computing bad debt reserve deductions, nor does it eliminate the carryback period allowed for mutual institutions.

### IV.

■ The fact the 26 C.F.R. § 1.593–6A(b)(vi)–(vii) directly contradicts the regulation which it replaces does not necessarily entitle it to less deference in our analysis. In *National Muffler,* for example, the Supreme Court refused to invalidate a Treasury Regulation merely because that regulation reversed the Treasury's previous interpretation that had remained in force for ten years. *National Muffler,* 440 U.S. at 484–86, 99 S.Ct. at 1310–11. In upholding the new interpretation, the Court stated: "We would be reluctant to adopt the rigid view that an agency may not alter its interpretation in light of administrative experience." *Id.* at 485, 99 S.Ct. at 1311.

It was, in fact, administrative experience that led to the eclipse of the old regulation: A 1978 memorandum to the Secretary of the Treasury from the Acting Assistant Secretary for Tax Policy demonstrates that the Treasury had become convinced that " 'the

position with respect to taxable income taken in the prior regulation was mistaken and without prior statutory authority.' " *Quoted in Pacific First,* 961 F.2d at 804. This memorandum anticipated the argument now advanced by the Commissioner for upholding the new regulation, namely that the old regulation " 'permitted thrift institutions to take unwarranted bad debt deductions through a liberal definition of the term 'taxable income,' which is contrary to the definition provided in the Code.' " *Id.*

The regulatory shift at issue in *National Muffler* was approved despite the absence of any explanation for the turnabout. *National Muffler,* 440 U.S. at 485, 99 S.Ct. at 1311. The Supreme Court was satisfied there that the new policy apparently "incorporated an interpretation thought necessary to match the statute's construction to the original congressional intent." *Id.* (footnote omitted).

Although it is true, as the Supreme Court recognized in *National Muffler,* that the consistency and contemporaneity of a Treasury Regulation is relevant to a court's review of that regulation,[5] they are not the only considerations behind the deference accorded a regulation. Flexibility, too, is important as it constitutes one of the basic precepts undergirding administrative law; to require an Act of Congress to undo an agency's initial interpretation of a statute would largely eviscerate the usefulness of this organic body of law.

### V.

■ Although Bell does not state its position in so many words, a portion of its argument relies upon a version of the traditional "re-enactment doctrine." The decision which the tax court followed in invalidating 26 C.F.R. § 1.593–6A(b)(5)(vi)–(vii) in this case,

---

4. The Ninth Circuit illustrated this point with the following example: Assuming a percentage of taxable income deduction figure of 40% and a tax rate of 46%, a taxpayer with $2,000,000 in income evenly divided over two years would pay a total tax of $552,000 for the two years. A taxpayer with the same net income, but unevenly distributed (i.e., $3,000,000 income the first year and $1,000,000 loss the second year), would pay a total tax of only $368,000. The effect of the challenged regulation is to subject the second taxpayer to the same tax as the first taxpayer. *See Pacific First,* 961 F.2d at 806.

5. "A regulation may have particular force if it is a substantially contemporaneous construction of the statute by those presumed to have been aware of congressional intent. If the regulation dates from a later period, the manner in which it evolved merits inquiry." *National Muffler,* 440 U.S. at 477, 99 S.Ct. at 1307. Our inquiry in this case was conducted above by comparing the arguments advanced on behalf of the new regulation with the plain language and legislative history of the statutes involved.

*Pacific First Fed. Sav. Bank v. Commissioner*, 94 T.C. 101, 1990 WL 16898 (1990), also relied upon this doctrine. Simply put, both Bell and the tax court conclude that Congress must have considered and approved the old regulation when it amended §§ 172 and 593 in 1969, as the old regulation was then in effect and Congress did not voice any disapproval.

However, neither Bell nor the tax court has pointed to any occasion when Congress even mentioned the old—or new—regulation. This fact is important to the workings of the re-enactment doctrine for a relevant factor in a court's review is "the degree of scrutiny Congress has devoted to the regulation during subsequent re-enactments of the statute." *National Muffler*, 440 U.S. at 477, 99 S.Ct. at 1307 (citations omitted). The regulations and statutes involved in this area are too complex for us to venture to assume Congress's intent through its silence. Therefore, we choose to not second-guess the Treasury on this matter. The Sixth Circuit was correct when it stated:

> The re-enactment doctrine is merely an interpretative tool fashioned by the courts for their own use in construing ambiguous legislation. It is most useful in situations where there is some indication that Congress noted or considered the regulations in effect at the time of its action. Otherwise, the doctrine may be as doubtful as the silence of the statutes and legislative history to which it is applied.

*Peoples Federal*, 948 F.2d at 302–03 (footnote omitted).

## VI.

Bell argues that, even if the tax court is reversed and the regulation upheld, the proposed retroactive application of the regulation is still open to challenge. Neither party raised this issue below in light of their primary focus on the validity of the regulation.

■ In addition, Bell seeks a remand for further tax court proceedings on a matter unrelated to the substance of this appeal, despite the fact that Bell's motion to dismiss this cross-appeal was previously granted by this court. Bell sought to reinstate this claim after a Treasury Decision favorable to its case was issued in the interim between the granting of its motion to dismiss its cross-appeal and the decision of this appeal. The Commissioner contests the grant of a remand on this latter ground, arguing that Bell should not be relieved of the consequences of its earlier decision to seek dismissal of its cross-appeal. We believe, however, that since the amount of Bell's tax liability is not yet final that the tax court should be allowed the opportunity to re-visit this issue in the light of its new regulations.

The Commissioner also requests remand in the event that the regulation is upheld in order to determine the issue of how the NOLs from 1983 and 1984 are to be allocated as between financial and nonfinancial income on Bell's 1978 return.

We express no view on the merits of these questions. We remand this case to allow the tax court to address these issues and to enter judgment consistent with this court's opinion.

REVERSED AND REMANDED.